ECEIPT #_____ 52-555
MOUNT $_____ 150.00
UMMONS ISSUED___ Y-15
OCAL RULE 4.1____
AIVER FORM_____
CF ISSUED_____
Y DPTY. CLK.____ M
ATE____ 12-9-05

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE

2003 DEC -8 P 4: 12

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| MARIA DAGOSTINO-GANNON, Individually and On Behalf of All Others Similarly Situated, ) ) ) | **CIVIL ACTION NO.** |
| Plaintiff, ) ) ) |  |
| vs. ) | CLASS ACTION COMPLAINT |
| ) ) | |
| PUTNAM INVESTMENTS TRUST, PUTNAM INVESTMENT MANAGEMENT LLC, PUTNAM INVESTMENT FUNDS, MARSH & MCLENNAN COMPANIES, INC., PUTNAM INTERNATIONAL CAPITAL OPPORTUNITIES FUND (formerly known as the PUTNAM INTERNATIONAL VOYAGER FUND), PUTNAM INTERNATIONAL EQUITY FUND, PUTNAM INTERNATIONAL GROWTH AND INCOME FUND, PUTNAM INTERNATIONAL NEW OPPORTUNITIES FUND, PUTNAM EUROPE GROWTH FUND, PUTNAM INTERNATIONAL GROWTH FUND, PUTNAM GLOBAL EQUITY FUND, PUTNAM EUROPE EQUITY FUND, PUTNAM INTERNATIONAL GROWTH FUND, PUTNAM INTERNATIONAL GROWTH AND INCOME FUND, PUTNAM INTERNATIONAL NEW OPPORTUNITIES FUND and DOES 1 - 100, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) ) | |

**03    12475 GAO**

**MAGISTRATE JUDGE** Dein

Plaintiff, Maria Dagostino-Gannon ("Plaintiff"), by her attorneys, as and for her

complaint, alleges the following upon personal knowledge as to herself and her acts and as to all

other matters upon information and belief the following:

## NATURE OF THE ACTION

1.      This action concerns a fraudulent scheme and course of action which was intended to and indeed did benefit the defendant mutual funds and their advisors to the expense of mutual fund investors.  In connection therewith, Defendants violated their fiduciary duties to their customers in return for substantial fees and other income for themselves and their affiliates.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Section 34(b) of the Investment Company Act of 1940, [15 U.S.C. § 80a-33(b)] ("the Act").  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1337 and 1367 and Section 44 of the Act, [15 U.S.C. § 80a-43].

3.      Venue is proper in this District pursuant to Section 44 of the Act, [15 U.S.C. § 80a-43], and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of material false and misleading information, occurred in substantial part in this District and Putnam conducts business in this District.

4.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff bought and held shares of Putnam International New Opportunity B during the Class Period and has suffered damages as a result of the wrongful acts of defendants as alleged herein.

5.    Defendant Marsh & McLennan Companies, Inc. ("Marsh & McLennan") is the ultimate parent of the Putnam Defendants named herein. Marsh & McLennan is a professional services firm that is headquartered at 1166 Avenue of the Americas, New York, NY, 10036.

6.    Defendant Putnam Investments Trust ("Putnam Investments") is a subsidiary of Marsh & McLennan and operates as Marsh & McLennan's investment management arm and is headquartered at One Post Office Square, Boston, MA.

7.    Defendant Putnam Investment Management LLC ("Putnam Investment Management") oversees the day-to-day management of the Putnam Funds (as defined below) and is headquartered at One Post Office Square, Boston, MA. Additionally, Putnam Investment Management LLC is a subsidiary of Putnam Investments.

8.    Defendant Putnam Investment Funds is the registrant and issuer of the Putnam Funds (as defined below) and is headquartered at One Post Office Square, Boston, MA.

9.    Defendants Marsh & McLennan, Putnam Investments, Putnam Investment Management, and Putnam Investment Funds are collectively referred to as the "Putnam Defendants."

10.    Defendants Putnam International Capital Opportunities Fund (formerly known as the Putnam International Voyager Fund), Putnam International Equity Fund, Putnam International Growth and Income Fund, Putnam International New Opportunities Fund, Putnam Europe Growth Fund, Putnam International Growth Fund, Putnam Global Equity Fund, Putnam Europe Equity Fund, Putnam International Growth Fund, Putnam International Growth and Income Fund, Putnam International New Opportunities Fund (collectively referred to as the "Putnam Funds"), among others, are mutual funds that are registered under the Act and managed

00001181.WPD ; 1                                    3

by Putnam Investment Funds. The Putnam Funds are headquartered at One Post Office Square, Boston, MA.

11.    The true names and capacities (whether individual, corporate, associate, or otherwise) of defendants Does 1 through 100, inclusive, and each of them, are unknown to Plaintiff, who sues said defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the defendants fictitiously named herein is legally responsible in some actionable manner for the events described herein, and thereby proximately caused the damage to the Plaintiff and the members of the Class.

## CLASS ACTION ALLEGATIONS

12.    Plaintiff brings this action as a federal class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all purchasers, redeemers and holders of the mutual fund shares that are the subject of this lawsuit, who purchased, held, or otherwise acquired shares between November 1, 1998 and September 3, 2003, inclusive, (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

13.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

14.    Plaintiff's claims are typical of the claims of the members of the Class, because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

15.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation.

16.    A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

17.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

> (a)    Whether the provisions of the Act were violated by Defendants' acts as alleged herein;
>
> (b)    Whether Defendants breached their fiduciary duties by engaging in fraudulent activity; and
>
> (c)    Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

18.    This action concerns a fraudulent scheme and course of action which was
intended to and indeed did benefit the Putnam Defendants, and their advisors at the expense of
unsuspecting mutual fund investors. In connection therewith, defendants violated their fiduciary
duties to their customers in return for substantial fees and other income for themselves and their
affiliates.

19.    The defendants' wrongful conduct involved "timing" of mutual funds. "Timing"
is an investment technique involving short-term, "in and out" trading of mutual fund shares. The
technique is designed to exploit inefficiencies in the way mutual fund companies price their
shares. It is widely acknowledged that timing inures to the detriment of long-term shareholders.
Because of this detrimental effect, mutual fund prospectuses typically state that timing is
monitored and the funds work to prevent it. Nonetheless, in return for investments that will
increase fund managers' fees, fund managers enter into undisclosed agreements to allow timing.

20.    In fact, certain mutual fund companies have employees (generally referred to as
the "timing police") who are supposed to detect "timers" and put a stop to their short-term
trading activity. Nonetheless, defendants arranged to give the Doe Defendants and other market
timers a "pass" with the timing police, who would look the other way rather than attempt to shut
down their short-term trading.

21.    The mutual fund prospectus for the Putnam Funds created the misleading
impression that the Putnam Funds were vigilantly protecting investors against the negative
effects of timing. In fact, the opposite was true: not only did Defendants sell the right to time the

00001181.WPD ; 1                             6

Putnam Funds to the Doe Defendants and other fund investors to time the Putnam Funds, but the prospectus was silent about these arrangements.

22.    As a result of "timing" of the Putnam Funds, the Doe Defendants, other timers, and defendants and their intermediaries profited handsomely. The losers were unsuspecting long-term mutual fund investors. Defendants' profits came dollar-for-dollar out of their pockets.

## TIMING

23.    Mutual funds are designed for buy-and-hold investors, and are therefore the favored homes for Americans' retirement and college savings accounts. Nevertheless, quick-turnaround traders routinely try to trade in and out of certain mutual funds in order to exploit inefficiencies in the way they set their NAVs.

24.    This strategy works only because some funds use "stale" prices to calculate the value of securities held in the fund's portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A typical example is a U.S. mutual fund that holds Japanese shares. Because of the time zone difference, the Japanese market may close at 2:00 a.m. New York time. If the U.S. mutual fund manager uses the closing prices of the Japanese shares in his or her fund to arrive at an NAV at 4:00 p.m. in New York, he or she is relying on market information that is fourteen hours old. If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it later opens, the stale Japanese prices will not reflect them, and the fund's NAV will be artificially low. Put another way, the NAV does not reflect the true current market value of the stocks the fund holds. On such a day, a trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling.

Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund.

25.     Effective timing captures an arbitrage profit, which comes dollar-for-dollar out of the pockets of the long-term investors: the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund. If the timer sells short on bad days the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

26.     Besides the wealth transfer of arbitrage (called "dilution"), timers also harm their target funds in a number of other ways. They impose their transaction costs on the long-term investors. Indeed, trades necessitated by a timer's redemptions can also lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market. Some fund managers even enter into special investments as an attempt to "hedge" against timing activity (instead of just refusing to allow it), thus deviating altogether from the ostensible investment strategy of their funds, and incurring further transaction costs.

27.     Mutual fund managers are aware of the damaging effect that timers have on their funds. While it is virtually impossible for fund managers to identify every timing trade, large movements in and out of funds -- like those made by the Doe Defendants-- are easy for managers to spot. And mutual fund managers have tools to fight back against timers.

28.     Fund managers typically have the power simply to reject timers' purchases. As fiduciaries for their investors, mutual fund managers are obliged to do their best to use these weapons to protect their customers from the dilution that timing causes.

29.     The incentive to the defendant mutual funds to engage in such wrongdoing is as follows: Typically a single management company sets up a number of mutual funds to form a family. While each mutual fund is in fact its own company, as a practical matter the management company runs it. The portfolio managers who make the investment decisions for the funds and the executives to whom they report are all typically employees of the management company, not the mutual funds themselves. Still, the management company owes fiduciary duties to each fund and each investor.

30.     The management company makes its profit from fees it charges the funds for financial advice and other services. These fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money the manager makes. The timer understands this perfectly, and frequently offers the manager more assets in exchange for the right to time. Fund managers have succumbed to temptation and allowed investors in the target funds to be hurt in exchange for additional money in their own pockets in the form of higher management fees.

31.     Thus, by keeping money -- often many millions of dollars -- in the same family of mutual funds (while moving the money from fund to fund), the Doe Defendants assured the defendants that they would collect management and other fees on the amount whether it was in the target fund, the resting fund, or moving in between. In addition, sometimes the manager would waive any applicable early redemption fees. By doing so, the manager would directly deprive the fund of money that would have partially reimbursed the fund for the impact of timing.

32.    As an additional inducement for allowing the timing, fund managers often received "sticky assets." These were typically long-term investments made not in the mutual fund in which the timing activity was permitted, but in one of the fund manager's financial vehicles that assured a steady flow of fees to the manager.

33.    These arrangements were never disclosed to mutual fund investors. On the contrary, many of the relevant mutual fund prospectuses contained materially misleading statements assuring investors that the fund managers discouraged and worked to prevent mutual fund timing.

## THE SCHEME CONCERNING THE PUTNAM FUNDS

34.    During the Class Period, defendants permitted the Doe Defendants and others to time the Putnam Funds.

35.    On September 3, 2003, New York Attorney General Elliot Spitzer (the "Attorney General") filed a complaint charging fraud, among other things, in connection with the unlawful practices alleged herein. More specifically, the Attorney General alleged the following: "Canary developed a complex strategy that allowed it to in effect sell mutual funds short and profit on declining NAVs." Additionally, the Attorney General alleged:

> Bank of America . . .(i) set Canary up with a state-of-the art electronic late trading platform, allowing it to trade late in the hundreds of mutual funds that the bank offers to its customers, (ii) gave Canary permission to time the Nations Funds Family (iii) provided Canary with approximately $300 million of credit to finance this late trading and timing, and (iv) sold Canary the derivative short positions it needed to time the funds as the market dropped. None of these facts were disclosed in the Nations Funds prospectuses. In the process, Canary became one of Bank of America's largest customers. The relationship was mutually beneficial in that Canary made tens of millions through late trading

and timing, while the various parts of the Bank of America that
serviced Canary made millions themselves.

36.     On September 16, 2003 the <u>Boston Herald</u> reported that Massachusetts Secretary

of State William Galvin ("Galvin") had confirmed that his staff had launched a probe into

possible improper fund trading at Putnam Investments in Boston.  More specifically, the <u>Boston</u>

<u>Herald</u> reported that Galvin was investigating improper market timing schemes employed by

Putnam mutual funds:

> The Putnam inquiry is Galvin's latest investigation into mutual
> fund trades and comes as the industry faces probes from other state
> and federal regulators.
>
> Galvin said his staff sent several subpoenas to Putnam last
> Thursday to learn about possible improper market timing - that is,
> making short-term trades of fund shares, often at the expense of
> long-term shareholders.
>
> "This is not a fishing expedition," Galvin said. "We obviously have
> probable cause of some kind to make these inquiries."
>
> The probe is focused on trades in one of Putnam's international
> funds, according to a source in Galvin's office.
>
> When asked about the probe, Putnam spokeswoman Nancy Fisher
> said: "We received an inquiry from the state of Massachusetts and
> are responding."
>
>                                   \* \* \*
>
> "This effort is about (making) sure that the average investor,
> especially in mutual funds, is treated fairly," Galvin said.
>
> Though market timing isn't illegal, the practice is often publicly
> discouraged by fund firms because they say it can hurt fund
> performance for long-term investors. Regulators are, among other
> things, focusing on trades that take advantage of the lag between
> the once-a-day pricing of funds and the value of their underlying stocks.
>
> Putnam, a unit of New York-based Marsh & McLennan Cos.,
> issued a statement last week claiming that it has had a policy to

protect its funds from excessive trading and market timing since 1997. Putnam said its controls include short-term trading fees, a technique known as "fair value pricing," daily monitoring of trading activity and revoking the trading privileges of people who violate its policy.

Galvin's probe comes at a bad time for Putnam, as investors continue to pull money out of its funds despite the recent stock market surge. Putnam had the largest net outflows of fund assets of any of the 25 biggest fund firms through July 31, with nearly $ 7.3 billion leaving Putnam's funds in that time, according to Financial Research Corp. data.

But Fisher said Putnam's net outflows improved from last year and the rate at which Putnam investors are taking money out of the funds for other uses is well below the industry average.

Putnam's funds have suffered more than most companies' funds because many managers at Putnam bet heavily on high-tech stocks that later crashed, Morningstar analyst Matt Scholz said. "They've had a lot of problems in the last year or two," he said. "If it turns out that there are certain improprieties going on there, they might be impacted worse than other fund families."

37.     On October 21, 2003, the <u>Boston Globe</u> reported that Massachusetts Secretary of

State Galvin was to charge Putnam Investments with civil securities fraud, alleging that the firm

had engaged in improper market timing.  More specifically, the <u>Boston Globe</u> reported:

Massachusetts Secretary of State William F. Galvin plans to charge Putnam Investments with civil securities fraud within the next few days, say two people involved in the investigation. The charges would ensnare one of Boston's largest mutual fund firms in a burgeoning probe into abusive practices in the fund industry.

Galvin and New York Attorney General Eliot Spitzer have moved aggressively in the last two months against the mutual fund industry, which had largely avoided the lawsuits and scandals that have plagued corporate America and the securities industry since the Internet bubble burst in early 2000. Spitzer, in particular, has shown that certain big investors received preferential treatment at some fund houses, undermining investors' faith that the rules apply

equally to all shareholders. Formal complaints against Putnam, the nation's fifth-largest fund family, would suggest that the scope of the inquiries is widening.

Investigators are probing whether the trading practice known as market timing -- trading quickly into and out of funds, to take advantage of short-term price fluctuations -- was being employed by small-time individual investors as well as by sophisticated brokerage houses. The two people involved in the investigation said the state Securities Division, which Galvin oversees, intends to charge Putnam with at least two counts of securities fraud. One count would allege the company let individuals trade rapidly in and out of their mutual fund accounts -- despite company policies that prohibit excessive trading. A second would allege that Putnam failed to treat shareholders equally, by allowing some to market-time their accounts, and not others.

The state is expected to allege that by not upholding its policies, Putnam in effect said one thing and did another as well as treated its customers unequally. The state is expected to argue that both would constitute civil fraud in Massachusetts.

Under Massachusetts law, each violation carries a penalty of up to $25,000. It's not known how many violations the state hopes to document. In a statement, Putnam said that "any accusation of improper behavior related to market timing across our client base is simply not true. We recently completed a thorough review of market timing in our mutual funds as far back from 1998 to the present and have determined that nothing illegal occurred during that period."

Putnam said it learned of the pending complaint against the firm late yesterday.

The Massachusetts investigation of Putnam funds concerns mutual fund accounts of members of several New York trade unions and workers involved in the cleanup of the US government's Hanford nuclear waste site in Washington state, according to a subpoena Galvin's office issued to Putnam last month, a copy of which was obtained by the Globe.

The subpoena demanded documents covering the period from Jan. 1, 2000, to the present related to its administration of investment

funds for the Boilermakers Union, Local No. 5, in New York; the
Joint Industry Board of Electrical Industry, which manages some
benefits for union electricians in New York; and Fluor Hanford
Inc., a unit of the California engineering and construction firm
Fluor Corp. that runs the retirement plan for more than 11,000
employees from about 10 companies working on the cleanup of the
polluted US nuclear reservation in Washington state.

The state has also asked that Putnam produce account records of 11
individual investors, though it does not identify where the 11
worked.

38.    As such, defendants have breached their fiduciary duties to plaintiff and the class

by lying to investors about their effort to curb market timers by entering into undisclosed

agreements intended to boost their fees and permitting the Doe Defendants to time the mutual

funds.

### FIRST CAUSE OF ACTION
### (For Violations of Section 34 of the Investment Company Act)

39.    Plaintiff repeats and realleges all of the paragraphs set forth above.

40.    Through the course of conduct alleged herein, Defendants have made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements

not misleading in violation of Section 34 of the Act, [15 U.S.C. § 80a-33(b)].

41.    As a direct and proximate result of Defendants' wrongful conduct alleged herein,

Plaintiff and the other members of the Class have suffered damages.

### SECOND CAUSE OF ACTION
### (For Breach of Fiduciary Duty)

42.    Plaintiff repeats and realleges all of the paragraphs set forth above.

43.    By engaging in the wrongdoing alleged herein, Defendants have breached and are

breaching their fiduciary duties owed to Plaintiff and the other members of the Class.

44.     Plaintiff and the Class have been specifically injured by defendants' wrongdoing. For example, those class members who redeemed their shares during the Class Period received less than what they would have been entitled to had certain individuals not engaged in illegal market timing and late trading. Additionally, certain members of the Class (i.e., those who purchased their mutual fund shares legally), were treated differently than those purchasers that were market timers and/or late traders. Defendants acted in bad-faith in connection with the wrongful conduct complained of in this complaint.

45.     Additionally, Defendants have breached their duty of candor owed to Plaintiff and the Class.

**WHEREFORE**, Plaintiff demands judgment against the Defendants as follows:

(a)     Declaring this action to be a class action and certifying Plaintiff as a class representative and Plaintiff's counsel as class counsel;

(b)     Enjoining, preliminarily and permanently, the transactions complained of herein;

(c)     Directing that Defendants account to Plaintiff and the other members of the Class for all damages caused to them and account for all profits and any special benefits obtained as a result of their unlawful conduct;

(d)     Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(e)     Granting Plaintiff and the other members of the Class such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 8, 2003

Respectfully submitted,

**GILMAN AND PASTOR , LLP**

David Pastor (BBO #391000)
Stonehill Corporate Center
999 Broadway
Suite 500
Saugus, MA 01906
Telephone:    (781) 231-7850
Facsimile:    (781) 231-7840

**CAULEY GELLER BOWMAN &**
  **RUDMAN, LLP**
Samuel H. Rudman
David A. Rosenfeld
Mario Alba Jr.
200 Broadhollow Road, Suite 406
Melville, NY 11747
Telephone:    (631) 367-7100
Facsimile:    (631) 367-1173

**Attorneys for Plaintiff**

00001181.WPD ; 1                    16